**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

TV TOKYO CORPORATION,

      Plaintiff,

v.

THE PARTNERSHIPS AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

      Defendants.

Case No.: 1:24-cv-00064

## COMPLAINT

Plaintiff, TV TOKYO CORPORATION ("TV TOKYO" or "Plaintiff"), by its undersigned counsel, hereby files this Complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants"), and for its Complaint hereby alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., the Federal Copyright Act, 17 U.S.C. § 101, et seq., 28 U.S.C. § 1338(a)–(b), and 28 U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets consumers in the United States, including Illinois, through at least the fully interactive commercial internet stores operating under the Defendant aliases and/or the online marketplace accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores"). Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive internet stores through which Illinois residents can purchase

1

products bearing counterfeit and infringing versions of Plaintiff's trademarks and works. Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold products bearing counterfeit and infringing versions of Plaintiff's federally registered trademarks and works to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the State of Illinois.

3.      This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this judicial district, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this judicial district.

## INTRODUCTION

4.      This action has been filed to combat online trademark and copyright infringers who trade upon Plaintiff's reputation and goodwill and valuable trademarks and copyrights by selling and/or offering for sale products, hereinafter referred to as the "NARUTO Products" in connection with Plaintiff's federally registered NARUTO Trademarks, which are covered by U.S. Trademark Registration Nos. 3,229,574; 3,280,366; and 3,726,754 for the "NARUTO" word mark in international classes 9, 16, 25, and 41 (collectively the "NARUTO Trademarks"). The registrations are valid, subsisting, unrevoked, uncancelled, and incontestable. The registrations for the trademarks constitute prima facie evidence of validity and of Plaintiff's exclusive right to use the trademarks pursuant to 15 U.S.C. § 1057(b). Genuine and authentic copies of the registration certificates for the NARUTO Trademarks are attached as **Exhibit 1**.

5.      In addition, Defendants are selling unauthorized products that are based on and derived from the copyrighted subject matter created by TV TOKYO, hereinafter referred to as the "NARUTO Works." Plaintiff is the owner of Copyright Registration Nos. PA 2-277-887 and PA 2-276-002 (collectively the "NARUTO Works") attached hereto as **Exhibit 2**.

6.      In the past, Plaintiff was able to police its marks against identifiable infringers and counterfeiters. The rise of online retailing, coupled with the ability of e-commerce sites to hide their identities, has made it nearly impossible for policing actions to be undertaken since availing itself of takedown procedures to remove infringing products would be an ineffective and endless game of whack-a-mole against the mass counterfeiting that is occurring over the internet. The aggregated effect of the mass counterfeiting that is taking place has overwhelmed Plaintiff and its ability to police its rights against the hundreds of anonymous defendants which are selling illegal counterfeits at prices below an original:

ORIGINAL



https://www.tv-tokyo.co.jp/anime/naruto/index2.html

COUNTERFEIT



7.     The above example evidences a cooperative counterfeiting network using fake eCommerce storefronts designed to appear to be selling authorized products. To be able to offer the counterfeit and/or infringing products at a price substantially below the cost of original, while still being able to turn a profit after absorbing the cost of manufacturing, advertising, and shipping requires an economy of scale only achievable through a cooperative effort throughout the supply chain. As Homeland Security's recent report confirms, counterfeiters act in concert through coordinated supply chains and distribution networks to unfairly compete with legitimate brand owners while generating huge profits for the illegal counterfeiting network:

> Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. **Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks.** The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, sellers on digital

4

platforms have consumer visibility well beyond the seller's natural geographical sales area.

. . .

The impact of counterfeit and pirated goods is broader than just unfair competition. Law enforcement officials have uncovered intricate links between the sale of counterfeit goods and transnational organized crime. **A study by the Better Business Bureau notes that the financial operations supporting counterfeit goods typically require central coordination**, making these activities attractive for organized crime, with groups such as the Mafia and the Japanese Yakuza heavily involved. Criminal organizations use coerced and child labor to manufacture and sell counterfeit goods. In some cases, the proceeds from counterfeit sales may be supporting terrorism and dictatorships throughout the world.

. . .

Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

*See* Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (https://www.dhs.gov/publication/combating-trafficking-counterfeit-and-pirated-goods), at 10, 19 (emphasis added) attached hereto as **Exhibit 3**.

8.      The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the unauthorized products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants use aliases to avoid liability by going to great lengths to conceal both their identities as well as the full scope and interworking of their illegal network. Despite deterrents such as takedowns and other measures, the use of aliases enables counterfeiters to stymie authorities:

The scale of counterfeit activity online is evidenced as well by the significant efforts e-commerce platforms themselves have had to undertake. A major e-commerce platform reports that its proactive efforts prevented over 1 million suspected bad actors from publishing a single product for sale through its platform and blocked over 3 billion suspected counterfeit listings from being published to their marketplace. Despite efforts such as these, private sector actions have not been sufficient to prevent the importation and sale of a wide variety and large volume of counterfeit and pirated goods to the American public.

. . .

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.

. . .

Not only can counterfeiters set up their virtual storefronts quickly and easily, but they can also set up new virtual storefronts when their existing storefronts are shut down by either law enforcement or through voluntary initiatives set up by other stakeholders such as market platforms, advertisers, or payment processors.

*Id.* at 5, 11, 12.

9.     eCommerce giant Alibaba has also made public its efforts to control counterfeiting on its platform. It formed a special task force that worked in conjunction with Chinese authorities for a boots-on the ground effort in China to stamp out counterfeiters. In describing the counterfeiting networks it uncovered, Alibaba expressed its frustration in dealing with "vendors, affiliated dealers and factories" that rely upon fictitious identities that enable counterfeiting rings to play whack-a-mole with authorities:

# Fighting China's counterfeits in the online era

Xinhua | Updated: 2017-09-19 14:20                              

BEIJING - A secret team in Chinese e-commerce giant Alibaba has the task of pretending to be online consumers who test-buy purchases from the billion-plus products on its platforms.

Alibaba's Anti-Counterfeiting Special Task Force, formed last year, actively works with local law enforcement agencies, said Qin Seng.

"After we clean up online shops selling counterfeits, the counterfeiters usually change their identities and places of dispatch, using more covert means to continue selling online," Qin said.

The team uses big data to identify counterfeits and the vendors, affiliated dealers and factories suspected of producing or selling counterfeit items. They pass evidence to the public security, administration of commerce and industry, quality inspection, food and drug supervision and other law enforcement agencies. At the same time, they investigate the evidence in the field.

The team faces many risks in their offline probes.

"Most counterfeiting dens are hidden and well-organized. For example, we encountered a village producing counterfeits. The villagers installed cameras everywhere and when they saw outsiders entering, they became vigilant and even threatened us," Qin said.

*See* Xinhua, *Fighting China's Counterfeits in the Online Era,* China Daily (Sept. 19, 2017), available at www.chinadaily.com.cn/business/2017-09/19/content_32200290.htm  (**Exhibit 4**).

10.     Plaintiff has been and continues to be irreparably damaged through consumer confusion, loss of control over its reputation and goodwill as well as the quality of goods bearing the NARUTO Trademarks and Works. The rise of eCommerce as a method of supplying goods to the public exposes brand holders and creators that make significant investments in their products to significant harm from counterfeiters:

> Counterfeiting is no longer confined to street-corners and flea markets. The problem has intensified to staggering levels, as shown by a recent Organisation for Economic Cooperation and Development (OECD) report, which details a 154 percent increase in counterfeits traded internationally — from $200 billion in 2005 to $509 billion in 2016. Similar information collected by the U.S. Department of Homeland Security (DHS) between 2000 and 2018 shows that seizures of infringing goods at U.S. borders have increased 10-fold, from 3,244 seizures per year to 33,810.
>
> …
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. It is no longer

enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.

. . .

Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.

. . .

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

*See Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, (**<u>Exhibit 3</u>**) at 4, 8, 11.

11.     Not only are the creators and brand holders harmed, the public is harmed as well:

The rapid growth of e-commerce has revolutionized the way goods are bought and sold, allowing for counterfeit and pirated goods to flood our borders and penetrate our communities and homes. Illicit goods trafficked to American consumers by e-commerce platforms and online third-party marketplaces threaten public health and safety, as well as national security. This illicit activity impacts American innovation and erodes the competitiveness of U.S. manufacturers and workers.
The President's historic memorandum provides a much warranted and long overdue call to action in the U.S. Government's fight against a massive form of illicit trade that is inflicting significant harm on American consumers and businesses. <u>This illicit trade must be stopped in its tracks</u>.

*Id.* at 3, 4. (Underlining in original).

12.     Plaintiff's investigation shows that the telltale signs of an illegal counterfeiting ring are present in the instant action. For example, Schedule A shows the use of store names by the Defendant Internet Stores that employ no normal business nomenclature and, instead, have the

8

appearance of being made up, or if a company that appears to be legitimate is used, online research shows that there is no known address for the company. Thus, the Defendant Internet Stores are using fake online storefronts designed to appear to be selling genuine Plaintiff products, while selling inferior imitations of Plaintiff's products. The Defendant Internet Stores also share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale, establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their illegal counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting and infringement of Plaintiff's registered Trademarks and Works, as well as to protect unknowing consumers from purchasing unauthorized NARUTO Products over the internet.

13.     This Court has personal jurisdiction over each Defendant, in that each Defendant conducts significant business in Illinois and in this judicial district, and the acts and events giving rise to this lawsuit of which each Defendant stands accused were undertaken in Illinois and in this judicial district. In addition, each defendant has offered to sell and ship infringing products into this judicial district.

## THE PLAINTIFF

14.     TV TOKYO is a leading Japanese content producer and broadcaster of movies and videos with a particular strength in animation. Plaintiff has a principal place of business at Roppongi Grand Tower, 3-2-1 Roppongi, Minato-ku, Tokyo 106-8001 Japan. TV TOKYO is a company organized and existing under the laws of Japan.

15.     TV TOKYO is in the business of developing, marketing, licensing, selling, and distributing the NARUTO-branded television series and theatrical films worldwide and exclusively manages the licensing of NARUTO-branded products and services worldwide, having been appointed to do so by the manga series publisher and registered owner of the NARUTO Trademarks, Shueisha Inc.  NARUTO is one of the best-selling Japanese manga series in history. NARUTO was written and illustrated by the renowned author and artist, Masashi Kishimoto. 250 million copies of the NARUTO manga series have been circulated worldwide in 46 countries and regions. English translations of the NARUTO manga series have consistently appeared on the USA Today and The New York Times bestseller lists. Plaintiff TV TOKYO co-produced and distributes the NARUTO franchise of animated television series and theatrical films together with Shueisha Inc. The NARUTO brand of products, distributed, and/or licensed by Plaintiff TV TOKYO, has expanded beyond the manga series and audiovisual properties to cover a variety of other areas, including toys, games, back-to-school items, stationery, apparel, accessories, and all kinds of household commodities, food and beverages.  Plaintiff, through its duly authorized licensees, is the official source of NARUTO Products.

16.     The NARUTO Trademarks and Works have been continuously used and never been abandoned. The NARUTO trademark and copyright registrations are valid, subsisting, and in full force and effect. The registrations of the NARUTO Trademarks constitute *prima facie* evidence of their validity pursuant to 15 U.S.C. § 1057(b).

17.     TV TOKYO has invested substantial time, money, and effort in building up and developing, advertising, and otherwise promoting the NARUTO Trademarks and Works. As a result, products associated with the NARUTO Trademarks and Works are recognized and exclusively associated by consumers, the public, and the trade, as being products sourced from Plaintiff.

18.     TV TOKYO has made efforts to protect its interests in and to the NARUTO Trademarks and Works. No one other than TV TOKYO and its licensees are authorized to manufacture, import, export, advertise, offer for sale, or sell any goods utilizing the NARUTO Trademarks and/or Works without the express written permission of TV TOKYO.

### THE DEFENDANTS

19.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within Illinois and in this judicial district, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell and, on information and belief, has sold and continues to sell unauthorized NARUTO Products to consumers within the United States, including Illinois, and in this judicial district.

### THE DEFENDANTS' UNLAWFUL CONDUCT

20.     The success of the NARUTO Products has resulted in their counterfeiting and intentional copying. Defendants conduct their illegal operations through fully interactive commercial websites hosted on various e-commerce sites. Each Defendant targets consumers in the United States, including the State of Illinois, and has offered to sell and, on information and belief, has sold and continues to sell counterfeit and/or infringing products that violate Plaintiff's intellectual property rights ("Counterfeit and Infringing Products") to consumers within the United States, including the State of Illinois.

21.     The Defendant Internet Stores intentionally conceal their identities and the full scope of their counterfeiting operations in an effort to deter Plaintiff from learning Defendants' true identities and the exact interworking of Defendants' illegal counterfeiting operations. Through

their operation of the Defendant Internet Stores, Defendants are directly and personally contributing to, inducing, and engaging in the sale of Counterfeit and Infringing Products as alleged, often times as partners, co-conspirators, and/or suppliers. Upon information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit and Infringing Products.

22.     Upon information and belief, at all times relevant hereto, the Defendants in this action have had full knowledge of Plaintiff's ownership of the NARUTO Trademarks and Works, including its exclusive right to use and license such intellectual property and the goodwill associated therewith.

23.     Defendants often go to great lengths to conceal their identities by often using multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

24.     The Counterfeit and Infringing NARUTO Products for sale in the Defendant Internet Stores bear similarities and indicia of being related to one another, suggesting that the Counterfeit and Infringing NARUTO Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same store name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate

12

SEO tactics, HTML user-defined variables, lack of contact information, identically or similarly priced items and volume sales discounts, similar hosting services, similar name servers, and the use of the same text and images.

25.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring takedown demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection. A 2021 U.S. Customs and Border Protection report on seizure statistics indicated that e-commerce sales accounted for 13.3% of total retail sales with second quarter of 2021 retail e-commerce sales estimated at $222.5 billion. U.S. Customs and Border Protection, *Intellectual Property Right Seizure Statistics*, FY 2021 (https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf) at 23. A true and correct copy of CBP's FY 2021 report is attached hereto as **Exhibit 5**. In FY 2021, there were 213 million express mail shipments and 94 million international mail shipments. *Id*. Nearly 90 percent of all intellectual property seizures occur in the international mail and express environments. *Id* at 27.  The "overwhelming volume of small packages also makes CBP's ability to identify and interdict high-risk packages difficult." *Id*. at 23.

26.     Further, counterfeiters such as Defendants, typically operate multiple credit card merchant accounts and third-party accounts, such as PayPal, Inc. ("PayPal") accounts, behind layers of payment gateways so that they can continue operating in spite of Plaintiff's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court. Indeed, analysis of PayPal transaction logs from previous similar cases indicates that offshore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

27.     Upon information and belief, Defendants also deceive unknowing consumers by using the NARUTO Trademarks and Works without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the Internet looking for websites relevant to consumer searches for NARUTO Products. Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine NARUTO Products. Further, Defendants utilize similar illegitimate SEO tactics to propel new online marketplace accounts to the top of search results after others are shut down.

28.     Defendants' use of the NARUTO Trademarks and Works on or in connection with the advertising, marketing, distribution, offering for sale and sale of the Counterfeit and Infringing Products is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff. Defendants have manufactured, imported, distributed, offered for sale, and sold Counterfeit and Infringing Products using the NARUTO Trademarks and Works and continue to do so.

29.     Defendants, without authorization or license from Plaintiff, knowingly and willfully used and continue to use the NARUTO Trademarks and Works in connection with the advertisement, offer for sale and sale of the Counterfeit and Infringing Products, through, inter alia, the internet. The Counterfeit and Infringing Products are not genuine NARUTO Products. The Plaintiff did not manufacture, inspect, or package the Counterfeit and Infringing Products and did not approve the Counterfeit and Infringing Products for sale or distribution. The Defendant Internet Stores offer shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold Counterfeit and Infringing Products into the United States, including Illinois.

30.     Upon information and belief, Defendants will continue to register or acquire listings for the purpose of selling Counterfeit Goods that infringe upon the NARUTO Trademarks unless preliminarily and permanently enjoined.

31.     Defendants' use of the NARUTO Trademarks and Works in connection with the advertising, distribution, offering for sale, and sale of Counterfeit and Infringing NARUTO Products, including the sale of Counterfeit and Infringing NARUTO Products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

32.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

33.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered NARUTO Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of

infringing goods. The NARUTO Trademarks are distinctive. Consumers have come to expect the highest quality from TV TOKYO and from NARUTO Products offered, sold, or marketed under the NARUTO Trademarks.

34.     Without TV TOKYO'S authorization or consent, with knowledge of TV TOKYO'S well-known and prior rights in its NARUTO Trademarks and with knowledge that Defendants' Counterfeit Products bear counterfeit marks, Defendants intentionally reproduced, copied, and/or colorably imitated the NARUTO Trademarks used spurious designations that are identical with, or substantially indistinguishable from, the NARUTO Trademarks on or in connection with the manufacturing, import, export, advertising, marketing, promotion, distribution, display, offering for sale and/or sale of Counterfeit Products.

35.     Defendants have manufactured, imported, exported, advertised, marketed, promoted, distributed, displayed, offered for sale, and/or sold their Counterfeit Products to the purchasing public in direct competition with TV TOKYO, in or affecting interstate commerce, and/or have acted with reckless disregard of Plaintiff's rights in and to the NARUTO Trademarks through their participation in such activities.

36.     Defendants have applied their reproductions, counterfeits, copies, and colorable imitations of the NARUTO Trademarks to packaging, point-of-purchase materials, promotions, and/or advertisements intended to be used in commerce upon, or in connection with, the manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale, and/or selling of Defendants' Counterfeit Products, which is likely to cause confusion, mistake, and deception among the general purchasing public as to the origin of the Counterfeit Products, and is likely to deceive consumers, the public and the trade into believing that the Counterfeit Products sold by Defendants originate from, are associated with, or are

otherwise authorized by TV TOKYO, thereby making substantial profits and gains to which they are not entitled in law or equity.

37.     Defendants' unauthorized use of the NARUTO Trademarks on or in connection with the Counterfeit Products was done with notice and full knowledge that such use was not authorized or licensed by TV TOKYO, and with deliberate intent to unfairly benefit from the incalculable goodwill inherent in the NARUTO Trademarks.

38.     Defendants' actions constitute willful counterfeiting of the NARUTO Trademarks in violation of 15 U.S.C. §§ 1114(1)(a)-(b), 1116(d), and 1117(b)-(c).

39.     Defendants continued, knowing, and intentional use of the NARUTO Trademarks without TV TOKYO'S consent or authorization constitutes intentional infringement of the NARUTO Trademarks in violation of §32 of the Lanham Act, 15 U.S.C. § 1114.

40.     Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to Plaintiff's reputation and the goodwill of the NARUTO Trademark.

41.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of counterfeit NARUTO Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN, PASSING OFF & UNFAIR COMPETITION
### (15 U.S.C. § 1125(a)/LANHAM ACT § 43(a))

42.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

43.     Defendants' promotion, marketing, offering for sale, and sale of infringing NARUTO Products has created and is creating a likelihood of confusion, mistake, and deception among the

public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' infringing products by Plaintiff.

44.     By using the NARUTO Trademarks in connection with the sale of unauthorized products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the unauthorized products.

45.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the unauthorized products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

46.     Upon information and belief, Defendants' aforementioned wrongful actions have been knowing, deliberate, willful, intended to cause confusion, to cause mistake, and to deceive the purchasing public and with the intent to trade on the goodwill and reputation of TV TOKYO, its NARUTO Products, and NARUTO Trademarks.

47.     Plaintiff has no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

**COUNT III**
**COPYRIGHT INFRINGEMENT 17 U.S.C. § 501(a)**

48.     Plaintiff repleads and incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

49.     Plaintiff's copyrights have significant value and have been produced and created at considerable expense.

50.     Plaintiff, at all relevant times, has been the holder of the pertinent exclusive rights infringed by Defendants, as alleged hereunder, including but not limited to the copyrighted NARUTO Works, including derivative works. The NARUTO Works are the subject of valid copyright registrations. (**Exhibit 2**).

51. Upon information and belief, Defendants had access to the copyrighted works through Plaintiff's normal business activities. After accessing the NARUTO Works, Defendants wrongfully created copies of the copyrighted works without Plaintiff's consent and engaged in acts of widespread infringement.

52. TV TOKYO is informed and believes and thereon alleges that Defendants further infringed TV TOKYO'S copyrights by making or causing to be made derivative works by producing and distributing reproductions without TV TOKYO'S permission.

53. Each Defendant, without the permission or consent of the Plaintiff, has and continues to sell online infringing derivative works of the copyrights. Each Defendant has violated Plaintiff's exclusive rights of reproduction and distribution. Each Defendant's actions constitute an infringement of Plaintiff's exclusive rights protected under the Copyright Act (17 U.S.C. §101 et seq.).

54. Further, as a direct result of the acts of copyright infringement, Defendants have obtained direct and indirect profits they would not otherwise have realized but for their infringement of the copyrighted NARUTO Works. TV TOKYO is entitled to disgorgement of Defendants' profits directly and indirectly attributable to their infringement of the NARUTO Works.

55. The foregoing acts of infringement constitute a collective enterprise of shared, overlapping facts and have been willful, intentional, and in disregard of and with indifference to the rights of the Plaintiff.

56. As a result of each Defendant's infringement of Plaintiff's exclusive rights under copyright, Plaintiff is entitled to relief pursuant to 17 U.S.C. §504.

57.     The conduct of each Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated or measured in money. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§502 and 503, Plaintiff is entitled to injunctive relief prohibiting each Defendant from further infringing Plaintiff's copyright and ordering that each Defendant destroy all unauthorized copies. Defendants' copies, plates, and other embodiment of the copyrighted works from which copies can be reproduced should be impounded and forfeited to TV TOKYO as instruments of infringement, and all infringing copies created by Defendants should be impounded and forfeited to TV TOKYO, under 17 U.S.C §503.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)   That Defendants, their affiliates, officers, agents, employees, attorneys, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

a.   using the NARUTO Trademarks and Works or any reproductions, copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not an authorized NARUTO Product or is not authorized by Plaintiff to be sold in connection with the NARUTO Trademarks and Works;

b.   passing off, inducing, or enabling others to sell or pass off any product or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under the NARUTO Trademarks and Works;

c.  committing any acts calculated to cause consumers to believe that Defendants' Counterfeit and Infringing NARUTO Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d.  further infringing the NARUTO Trademarks and Works and damaging Plaintiff's goodwill;

e.  otherwise competing unfairly with Plaintiff in any manner;

f.  shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not authorized by Plaintiff to be sold or offered for sale, and which bear the NARUTO Trademarks or which are derived from Plaintiff's NARUTO Works;

g.  using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Internet Stores, or any other online marketplace account that is being used to sell products or inventory not authorized by Plaintiff which bear the NARUTO Trademarks or which are derived from Plaintiff's NARUTO Works;

2)  That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiff a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through g, above;

3)  Entry of an Order that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces, social media platforms, Facebook, YouTube, LinkedIn, Twitter, internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Internet Stores, and online marketplace account registrars, shall:

21

a.  disable and cease providing services for any accounts through which Defendants engage in the sale of products not authorized by Plaintiff which bear the NARUTO Trademarks or which are derived from the NARUTO Works, including any accounts associated with the Defendants listed on Schedule A;

b.  disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products not authorized by Plaintiff which bear the NARUTO Trademarks or which are derived from Plaintiff's copyrights in the NARUTO Works; and

c.  take all steps necessary to prevent links to the Defendant Internet Stores identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Internet Stores from any search index;

4)  That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

5)  In the alternative, that Plaintiff be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the NARUTO Trademarks;

6)  For Judgment in favor of Plaintiff against Defendants that they have: a) willfully infringed Plaintiff's rights in its federally registered copyrights pursuant to 17 U.S.C. §501; and b) otherwise injured the business reputation and business of Plaintiff by Defendants' acts and conduct set forth in this Complaint;

7)  For Judgment in favor of Plaintiff against Defendants for actual damages or statutory damages pursuant to 17 U.S.C. §504, at the election of Plaintiff, in an amount to be determined at trial;

8)   That Plaintiff be awarded its reasonable attorneys' fees and costs; and

9)   Award any and all other relief that this Court deems just and proper.


DATED: January 3, 2024                          Respectfully submitted,

                                                */s/ Keith A. Vogt*
                                                Keith A. Vogt (Bar No. 6207971)
                                                Keith Vogt, Ltd.
                                                33 West Jackson Boulevard, #2W
                                                Chicago, Illinois 60604
                                                Telephone: 312-971-6752
                                                E-mail:  keith@vogtip.com

                                                ***ATTORNEY FOR PLAINTIFF***